No. 85-354

IN THE SUPREME COURT OF THE STATE OF MONTANA

1986

PAM DUNN,

Claimant and Respondent,

-vs-

CHAMPION INTERNATIONAL CORP.,
a self-insured employer under
Plan I,

Employer/Defendant and Appellant.

APPEAL FROM:   The Workers' Compensation Court, The Honorable
Timothy Reardon, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Garlington, Lohn & Robinson; Bradley J. Luck argued,
Missoula, Montana

For Respondent:

Thomas C. Bulman argued, Missoula, Montana

Submitted:   February 13, 1986

Decided:   June 19, 1986

Filed:   JUN 19 1986

*Ethel m. Harrison*

Clerk

Mr. Justice L. C. Gulbrandson delivered the Opinion of the Court.

Champion International (Champion), the self-insured employer, appeals a Workers' Compensation Court order which awards to respondent Pam Dunn 200 weeks of permanent partial disability benefits at $99 a week. The determinative issue on appeal is whether there is substantial, credible evidence to support the lower court's findings on respondent's lost earning capacity. We hold that there is no such evidence and, therefore, we reverse the lower court.

Since 1974 respondent has worked for Champion at its Bonner, Montana plant. Respondent injured her right knee at work in May 1980 and Champion, admitting liability for her resulting condition, paid her temporary total disability benefits. Dr. Westbrook performed knee surgery on respondent in July 1980. Respondent returned to work in September 1980. She was found to have a 15% impairment rating of her right leg and Champion offered her 45 weeks of permanent partial disability benefits. Champion paid two weeks of these benefits to respondent at the maximum statutory rate of $99 per week.

In June 1981 respondent injured her left knee while working for Champion. Champion now accepts liability for the left knee injury. Dr. Wooley performed surgery on the left knee in October 1983. Respondent returned to work at Champion after healing from this operation. In August 1984 respondent filed a petition for a hearing before the Workers' Compensation Court and a trial was held in November 1984. Respondent elected to seek disability benefits under § 39-71-703, MCA, for her actual loss of earning capacity resulting from her injuries.

The Five Valley Panel, a group of four doctors, extensively examined respondent in October 1984 and issued a

2

report on her condition. The Panel found that respondent suffered a 15% permanent partial impairment of her right leg (6% impairment of the whole woman) and no permanent partial impairment of the left knee. The Panel's October 1984 report states that her "condition is expected to stabilize and not progress . . . Patient may continue to work as she is doing." The report indicates the possibility of further deterioration of respondent's knees.

Dr. Jacobson, a member of the Five Valley Panel, testified by deposition and agreed with the Panel's evaluation of respondent's knees. He stated that the Panel's findings were unanimous; that no one could accurately forecast respondent's future problems or condition with her knees; that there was no reason for respondent to modify her present employment if she could physically handle it; that twisting and carrying heavy objects probably could aggravate respondent's knees but that simply standing probably would not affect them too much; that compared to the average person with normal knees, respondent stands a greater chance of future knee problems; and that he did not see any reason why respondent should not try to continue her present employment indefinitely if she could physically handle it and if she stayed away from bending and twisting.

Dr. Wooley also treated respondent for the injuries to her knees and he testified by deposition. Wooley agreed that the Five Valley Panel's report was a "reasonably fair assessment" of respondent's condition. He stated that respondent, due to her injuries and surgery, was now predisposed to arthritis of the knee; that "you would expect [her knees] to develop pain, spurring, joint narrowing . . . ;" that she would be prone to developing more symptoms with degenerative change; and that her right knee will likely be a problem in the future. He examined respondent in August

1984 and, as of that time, he said she did reasonably well at work and was not having any significant problems, except with one job requiring a lot of twisting and pivoting on her knees. He stated that she was able to handle all of the other jobs at work and that he believed she could probably still serve a very useful purpose at Champion. Dr. Wooley agreed that no one could accurately forecast what, when or if specific problems will occur with respondent's knees.

Shortly before trial, respondent advanced at the mill from a utility millworker to a panel patch operator. After her injuries, respondent earned more money at the mill than she had before the injury. As a utility millworker, respondent was trained for, and filled in at, several other mill job positions. She stated that her knees do not feel normal and that, depending on what she does at work, she suffers pain ranging from an ache to severe pain in her knees after work. Respondent stated that her new job causes pain ranging from an ache to severe pain from standing for eight hours. She stated that she was able, after her injury, to handle her present position at the mill and also her prior position of utility millworker. As a result of on the job training while she was a utility millworker, respondent stated that after her injury she could handle other jobs at the mill; specifically, the dryer feeder, veneer plugger, individual defect router, off bearer and size line feeder. She stated that she can sometimes handle the edge scraper position. Respondent stated that, "I am versatile enough that if they are short of people . . . they will send me where they need me." She was earning $10.51 an hour at the time of the hearing and had been earning $10.18 an hour in her previous position. She stated that "they seem satisfied with my work" and conceded that Dr. Westbrooke gave her an

4

unconditional work release in 1980 after the surgery on her right (worst) knee.

Norm Johnson, a Job Service counselor with 12½ years experience with the Job Service, also testified by deposition. He had interviewed respondent and he testified mainly to establish the actual loss of earning capacity which respondent had suffered. Johnson stated that employers tend to hire people without prior injuries to cut down absenteeism and to lower insurance costs. He felt that respondent's injuries were going to cause her problems performing her millworker job; i.e., being fast enough to perform her job and doing her job in a satisfactory manner. Johnson stated that he would not consider respondent for a millworker position after 1977 because it would cause a steady deterioration in her knees. He conceded that he knew nothing of the physical requirements for some of the jobs at the mill. He stated that if respondent had been required after her injuries to seek employment in another vocational area, she could have worked as a clerk (sales, payroll, production, accountant clerk, receptionist), a salesperson, secretary and a typist. He stated that in 1977, after her injuries, respondent's probable earnings would have been $2.50-$3.00 an hour (compared to her actual earnings of $6.31/hr.); in 1980, $3.50-$4.00/hr. (actual $8.38); in 1981, $3.75-$4.25/hr. (actual $9.13); in 1982, $4.00-$4.50/hr. (actual $9.83); in 1983, $4.25-$4.75/hr. (actual $9.83). The lower court adopted these figures and found that, just after her injury, respondent could earn $3.75/hr. (although she has earned at least $8-9/hr. for the last four years since her injury).

On cross-examination Johnson conceded that his was not an exhaustive list of all the jobs respondent could handle during these periods. He conceded that there were other jobs requiring some, but not extensive, training which respondent

5

could physically handle. He agreed that the pay differential he testified to might be different if these other jobs were included. Johnson admitted that he only considered the jobs respondent held pre-1974 (before she started work for Champion) and added one position, computer clerk, she had had vocational training for. He based his wage differentials on these jobs. Johnson stated that he did not include millworking positions in the list of possible jobs for respondent after her injuries because, "I believe that she may have been able to obtain these types of work, but I believe that she should not have considered those types of work." Johnson agreed that there are a number of jobs at the Champion Bonner facility that respondent is presently qualified for and can handle physically on a full-time basis. He thought she might not be able to handle them in the future.

Paul Van Gordon, a labor relations manager for Champion, also testified by deposition. He established that he had extensive knowledge of the physical and other requirements of the job positions at the Bonner plant. He testified that respondent could fully perform her job position at the Bonner mill, that she was an excellent employee, that she had no attendance problem (four to five absences a year), and that she had very high seniority in her job. He stated that there were seven different job positions which respondent can adequately handle and that there were similar positions in other mills in the Missoula area. He stated that within a 50 mile radius of Missoula there were 1,500 to 2,000 similar mill positions which respondent could handle with her experience and physical condition. He deemed respondent very employable.

The Workers' Compensation Court filed its decision in June 1985. The court found that "[i]f claimant should be

6

required to seek work in another area secondary to a knee deterioration and subsequent disability," she could work at the clerical, secretarial and typing positions enumerated by Norm Johnson of the Job Service. He found that _if_ claimant had been forced to quit working at Champion in 1980 because of her knee disability, she could have earned $3.50-$4.00 an hour. The court stated that it relied upon Johnson who "was qualified to state what the claimant's earning capacity would be should she become unable to continue in her present position secondary to a" knee deterioration. (Emphasis added.) The court found that respondent had a diminution in her hourly earning capacity of $4.63, based on her actual earnings of $8.38/hr. (in May 1980 at the time of her injury) minus $3.75/hr. (her wage capacity after the injury). After the injury, respondent went back to her old job at $8-$9 an hour. Based on the diminution computation, the court awarded respondent 200 weeks of permanent partial disability benefits at the statutory maximum of $99 a week. Champion appeals.

The only issue is whether there is substantial, credible evidence to support the lower court's findings on respondent's lost earning capacity. This Court will not overturn a decision of the Workers' Compensation Court where there is substantial evidence to support the findings of the lower court. Keene v. Anaconda Co. (1982), 201 Mont. 102, 652 P.2d 216; Shupert v. Anaconda Aluminum Co. (Mont. 1985), 696 P.2d 436, 42 St.Rep. 277.

The only evidence which supports the disputed finding (that respondent suffered a severe loss of earning capacity) is the deposition testimony of Norm Johnson, the Job Service counselor. As a result, this Court's function on review is somewhat different from that in most cases. We have repeatedly stated:

7

> "Ordinarily, this Court will not substitute its
> judgment for that of the Workers' Compensation
> Court in determining the weight and credibility to
> be given testimony. The reason for this is that
> this Court defers to the lower court's assessment
> of the demeanor and credibility of witnesses. Rule
> 52(a), M.R.Civ.P. However, when the critical
> evidence, particularly medical evidence, is entered
> by deposition, we have held that 'this Court,
> although sitting in review, is in as good a
> position as the Workers' Compensation Court to
> judge the weight to be given to such record
> testimony, as distinguished from oral testimony,
> where the trial court actually observes the
> character and demeanor of the witness on the
> stand.'" (Citations omitted).

Shupert, 696 P.2d at 439. This rule is applicable to Johnson's testimony.

Montana law allows partially disabled workers to choose between two types of permanent partial disability benefits. Such a worker can elect benefits under § 39-71-703, MCA, for actual loss of earning capacity or indemnity benefits under § 39-71-705, -708 for possible prospective loss in earning capacity. McDanold v. B.N. Transport, Inc. (Mont. 1984), 679 P.2d 1188, 41 St.Rep. 472. In the case at bar, respondent elected to seek benefits based upon her actual loss of earning capacity. The test for loss of earning capacity

> "is not whether there has been a loss of earnings
> or income caused by the injury, but rather has
> there been a loss of earning capacity -- a loss of
> ability to earn in the open labor market."

Fermo v. Superline Products (1978), 175 Mont. 345, 348, 574 P.2d 251, 253; Shaffer v. Midland Empire Packing Co. (1953), 127 Mont. 211, 213, 259 P.2d 340, 342.

As can be seen from the recent case of Hafer v. Anaconda Aluminum Co. (Mont. 1984), 684 P.2d 1114, 41 St.Rep. 1403, it is possible under this test for a worker to earn more after his injury and still collect disability benefits for loss of earning capacity. In Hafer, the claimant earned more after his injury than before and yet we found that he had suffered a 40% loss of earning capacity.

In the instant case, the lower court found that respondent had suffered a substantial loss of earning capacity. The court found that respondent could earn only $3.50-$4.00 per hour in 1980 after her injury. This finding corresponds exactly to the wage testimony of Norm Johnson, the Job Service counselor. In fact, Johnson's testimony is the only evidence which supports the court's finding of lost earning capacity. Johnson stated that if respondent had been forced to seek employment after her injuries, she could only work in clerical, sales and secretarial positions. He later added that he considered a computer data entry position for respondent when calculating her lost earning capacity. Johnson refused to consider respondent for any post-injury millworking positions in calculating her lost earning capacity. He felt such positions might cause deterioration of her knees and that she should not consider those positions. Johnson's testimony provides some evidence to support the court's finding of lost earning capacity. The determinative question here is whether his testimony constitutes the substantial, credible evidence required to uphold the lower court's finding of a drastic loss of earning capacity. We hold that it does not.

Initially, we note that respondent did testify that she had pain in her knees after working. This testimony may support a finding of some, slight loss of earning capacity. However, in our view her pain does not support the finding of a drastic loss of earning capacity, especially given her admissions that she could handle a number of millworking positions.

The court's finding of lost earning capacity is based upon Johnson's list (hereinafter "post-injury job list") of jobs respondent could work at after her injury. However, Johnson admitted the list was not meant to be exhaustive. He

9

further admitted that he only listed those jobs respondent worked at prior to working for Champion, plus one job (computer data entry) she had training for. The test for lost earning capacity, however, requires an analysis of earning ability in the open labor market. Johnson, by so limiting his post-injury job list, was not considering the open labor market. In this vein, Johnson conceded that he did not conduct any vocational testing of respondent.

Furthermore, Johnson's testimony is not credible insofar as he excluded any millworking positions from the post-injury job list. He admitted that he did not know the specific physical requirements of many millworker positions which respondent herself stated she could physically handle. And yet Johnson refused to consider respondent for those positions after her injuries. Johnson agreed that respondent could physically handle many of the millworking positions. He also agreed that there were a number of mill positions requiring very little physical activity. He conceded that there were several other Montana plywood plants with similar positions requiring little physical activity. These facts support a conclusion that the post-injury job list should have included millworking positions.

Further, Johnson's refusal to consider mill positions for the post-injury job list runs contra to all the other evidence admitted. The other witnesses, specifically respondent, Dr. Jacobson, Dr. Wooley and Paul Van Gordon, were eminently more qualified to testify on respondent's ability to handle mill positions after her injury. Respondent stated that she could handle seven or eight different kinds of jobs at the Champion mill after her injury and up until the present time. In fact, she has been working at the mill since her injuries and earns more than before her accidents. Both doctors that testified agreed that

respondent could continue working at Champion if she could handle the jobs. Dr. Wooley testified that she could handle many of the jobs at the mill. Lastly, the Five Valley Panel's medical report stated that respondent could continue working.

Van Gordon's testimony bears on respondent's ability to earn in an open labor market. He indicated that there are many (1,500 - 2,000) mill jobs near Missoula which respondent, with her experience, could physically handle. Both he and respondent agreed that Champion is satisfied with her work. Since respondent's first knee injury in 1980, she has continued to work at the Champion Bonner plant earning from over $8.00 an hour in 1980 to over $10.00 an hour in 1984.

Based on the foregoing testimony of respondent, Dr. Wooley, Dr. Jacobson, and Paul Van Gordon, we conclude that in a post-injury, open labor market respondent would not be limited to those low paying jobs detailed by Johnson. The lower court should have included millworking positions in those jobs used to compute respondent's earning capacity after her injury.

Moreover, it appears that the lower court relied upon the wrong grounds in awarding benefits to respondent. Respondent elected to seek benefits for her actual loss of earning capacity (under § 39-71-703, MCA). Nevertheless, the court's language clearly indicates that it awarded benefits for possible, future lost earning capacity. The court enumerated possible jobs for respondent if she "should be required to seek work in another area secondary to a knee deterioration and subsequent disability . . . " (Emphasis added.) The court found respondent could have earned $3.50 - $4.00 an hour if she had been forced to quit working at Champion due to her injury. Finally, the court relied on

11

Johnson's estimate of respondent's earning capacity should she become unable to work at Champion secondary to a knee deterioration. The court was clearly anticipating respondent's possible, future, lost income despite her choice of benefits for actual lost earning capacity.

We hold that substantial, credible evidence does not support the findings on lost earning capacity. We reverse the award of benefits and remand this case for a hearing on respondent's lost earning capacity and the entry of an appropriate order.

_____
Justice

We concur:

_____
Chief Justice

_____

_____

_____

_____
Justices

Mr. Justice Frank B. Morrison, Jr., Mr. Justice John C. Sheehy, and Mr. Justice William E. Hunt, Sr., dissenting:

The majority has substituted its judgment for that of the Workers' Compensation Court on a question of fact. We feel that the judge who heard the testimony is in a far better position than this Court to determine the weight to be given evidence offered by the employment expert.

_____

_____

_____
                    Justices

13