No. 99-074

IN THE SUPREME COURT OF THE STATE OF MONTANA

1999 MT 302

297 Mont. 165

990 P.2d 1245

---

WESLEY HALE,

Claimant and Appellant,

v.

ROYAL LOGGING,

Respondent/Insurer/Employer.

---

APPEAL FROM: Workers Compensation Court,

State of Montana,

The Honorable Mike McCarter, Judge presiding.

COUNSEL OF RECORD:

For Appellant:

Laurie Wallace, Bothe & Lauridsen, P.C.; Columbia Falls, Montana

For Respondent:

Andrew J. Utick, Utick & Grosfield; Helena, Montana

---

Submitted on Briefs: June 17, 1999

Decided: December 7, 1999

Filed:

---

Clerk

Justice Jim Regnier delivered the opinion of the Court.

1. ¶ Wesley Hale appeals from the Findings of Fact, Conclusions of Law and Judgment of the Workers' Compensation Court, which declared that Hale was not entitled to permanent partial disability benefits under § 92-703.1, RCM (1975) and that Hale was not entitled to attorney fees or costs. The determinative issue on appeal is whether the Workers' Compensation Court erred when it concluded that Hale was not entitled to permanent partial disability benefits under § 92-703.1, RCM (1975). We reverse and remand.

### FACTUAL BACKGROUND

2. ¶ Hale, a third-generation logger, began his career in the timber industry at the age of 17 working at a sawmill during the summer. The summer after Hale turned 18, he began working in the woods performing various timber-related jobs, including second loader, choker setter, bucker, and faller. In 1967 Hale went to work for Royal Logging (Royal) falling timber.

3. ¶ Arising out of and in the course of his employment with Royal, Hale slipped and fell while lopping tree tops on February 12, 1976, injuring his back. Approximately one month later Hale sought treatment for his back pain and weakness flexing his right foot. After being treated unsuccessfully with traction, it was determined that

surgery would be necessary. Hale underwent a laminectomy and discectomy on March 25, 1976.

4. ¶ Following his surgery, Hale remained off work for over three months. Prior to releasing Hale to return to work, Hale's surgeon indicated that he considered putting restrictions on Hale because being a sawyer was not conducive to good back function. However, Hale's surgeon recognized that Hale had to earn a living and logging was what Hale knew how to do and Hale's employer expected an unrestricted work release.

5. ¶ After being released back to work on June 21, 1976, Hale was assigned to a light duty position supervising a female brush clearing crew. Hale worked this position for more than four months, making approximately less than half of what he had been making falling timber. Following the position supervising the brush crew, Hale returned to work for Royal falling timber. Hale continued to fall timber for Royal until Royal ceased its operations in 1987. After his employment with Royal, Hale continued to work as a timber faller for various employers until problems with his knees, which were unrelated to his previous back injury, forced him to retire in 1997.

6. ¶ Beginning a couple of years after returning to work as a timber faller for Royal and continuing throughout his career, Hale often worked in pain and had difficulties with the dorsiflexion of his right foot due to a neurologic problem originating in his back. The neurologic problem caused Hale to experience numbness along his right leg and frequent charley horses.

7. ¶ While Hale never lost any time from work as a result of these problems, they caused him to work slower, which was conceded by Royal's vocational rehabilitation consultant. When limbing a tree, Hale had to stand up and stretch his back more often and he could not tolerate prolonged sitting or standing in one place due to his neurologic problem. In addition, Hale could no longer perform any heavy lifting following the surgery.

8. ¶ In Hale's occupation, he was paid by the piece, rather than by the hour. Although Hale could not quantify how many less trees he cut in a day due to his limitations, he was sure that he cut less trees because of his back.

9. ¶ As a result of Hale's condition and physical limitations, Hale's surgeon had recommended no heavy lifting over 30 pounds on a frequent basis, no torsional twisting while lifting over 10 to 20 pounds, and no kneeling, crouching, or crawling type activities that are hard on your back. Hale's surgeon retrospectively placed Hale at maximum medical healing in 1978, but did not provide an impairment rating until requested to do so in 1997. Due to Hale's back surgery and residual limitation of motion and weakness, Hale's surgeon provided him with a 10 percent impairment

rating of the whole man.

10. ¶ On December 19, 1997, Hale filed a Petition for Hearing with the Workers' Compensation Court regarding his claim for permanent partial disability benefits. A trial on the matter was held on September 1, 1998. Hale testified in person and presented one other witness on his behalf, a vocational rehabilitation consultant. Royal also presented a vocational rehabilitation consultant to defend against Hale's claim. The Workers' Compensation Court made its Findings of Fact, Conclusions of Law and Judgment on December 1, 1998. As part of the judgment, the Workers' Compensation Court determined that Hale was not entitled to permanent partial disability benefits under § 92-703.1, RCM (1975) and was not entitled to attorney fees and costs. Hale appeals from the Workers' Compensation Court's decision.

## STANDARD OF REVIEW

11. ¶ This Court employs two standards of review for Workers' Compensation Court decisions: We review the findings of fact to determine if they are supported by substantial, credible evidence, and we review conclusions of law to determine if they are correct. *See Turjan v. Valley View Estates* (1995), 272 Mont. 386, 390, 901 P.2d 76, 79 (citation omitted).

## DISCUSSION

12. ¶ Did the Workers' Compensation Court err when it concluded that Hale was not entitled to permanent partial disability benefits under § 92-703.1, RCM (1975)?

13. ¶ Hale contends that the Workers' Compensation Court's conclusion that Hale did not suffer a loss of earning capacity in the open labor market was not supported by fact or law and should be reversed. Conversely, Royal contends that Hale failed to carry his burden of proof to show that he had sustained a loss of earning capacity. The Workers' Compensation Court found the case of *Dunn v. Champion International Corporation* (1986), 222 Mont. 142, 720 P.2d 1186, to be controlling and concluded that Hale had failed to prove that his injury had reduced his ability to compete in the open labor market.

14. ¶ We have previously noted that the statutes in effect at the time of the injury govern a claimant's entitlement to benefits. *See Buckman v. Montana Deaconess Hosp.* (1986), 224 Mont. 318, 321, 730 P.2d 380, 382. Thus, the statutes in effect during 1976 govern Hale's entitlement to benefits.

15. ¶ Hale elected to seek permanent partial disability benefits under § 92-703.1, RCM

(1975), which states:

**92-703.1. Compensation for injuries causing partial disability.** (1) Weekly compensation benefits for injury producing partial disability shall be sixty-six and two-thirds per cent (sic) (66 2/3%) of the actual diminution in the worker's earning capacity measured in dollars, subject to a maximum weekly compensation of one-half (½) the state's average weekly wage.

(2) The compensation shall be paid during the period of disability, not exceeding however, five hundred (500) weeks in cases of partial disability; provided, however, that compensation for partial disability resulting from the loss of or injury to any member shall not be payable for a greater number of weeks than is specified in section 92-709 for the loss of the member.

Early on, we set forth the test applicable to a loss of earning capacity under this statute as "not whether there has been a loss of earnings or income caused by the injury, but rather has there been a loss of earning capacity–a loss of ability to earn in the open labor market." *See Shaffer v. Midland Empire Packing Co.* (1953), 127 Mont. 211, 213-14, 259 P.2d 340, 342.

16. ¶ In addition, we have previously stated that:

Earning capacity is not only determined by a comparison of pre-injury and post-injury wages, but also by age, occupational skills, education, previous health, remaining number of productive years and degree of physical or mental impairment.

*Chagnon v. Travelers Ins. Co.* (1993), 259 Mont. 21, 26, 855 P.2d 1002, 1005 (citations omitted). Thus, postinjury earnings are "but one item of evidence to be considered in the determination of future earning capacity." *Fermo v. Superline Prod.* (1978), 175 Mont. 345, 348, 574 P.2d 251, 253. Accordingly, a claimant may suffer an adverse effect on earning capacity regardless of whether actual postinjury earnings are greater than before the injury, if his ability to compete in the open labor market is lessened. *See Fermo*, 175 Mont. at 348-49, 574 P.2d at 253; *Hafer v. Anaconda Aluminum Co.* (1982), 198 Mont. 105, 109-11, 643 P.2d 1192, 1194-96.

17. ¶ This premise is illustrated in *Hafer*. Hafer injured his elbow in an industrial accident while employed by Anaconda Aluminum Company as an ironworker. After

returning to work, Hafer was earning approximately $3 more than he had at the time of the accident. *See Hafer*, 198 Mont. at 106, 643 P.2d at 1193. However, evidence was presented that Hafer's earning capacity in the open labor market had been diminished because of the accident:

[Hafer] has an implant in his elbow and is unable to straighten his arm; the turning of his arm is limited. . . . Hafer testified that although he could perform his duties as an iron worker, he could not perform them with the same ease. He also indicated that his arm was weaker and that it hurt his elbow and wrist when he was bolting a shell together.

*Hafer*, 198 Mont. at 111, 643 P.2d at 1195. In addition, a job service employee testified that if Hafer were required to go out in the open labor market in search of a job, his earning capacity would be greatly diminished. We have previously held that this type of evidence is sufficient to establish a loss of earning capacity. *See Hafer*, 198 Mont. at 111, 643 P.2d at 1195-96.

18. ¶ Since the Workers' Compensation Court found the decision in *Dunn* to be controlling, we feel it warrants discussion. Dunn had injured both her knees at different times while working for Champion. Following these accidents, Dunn was given unconditional work releases and returned to work in her time of injury position earning more than before the injuries. *See Dunn*, 222 Mont. at 143-45, 720 P.2d at 1187-88. Dunn testified that while she often worked in pain, she was able to handle her present and prior positions at the mill as well as other positions at the mill that she had been trained to perform as a utility millworker. *See Dunn*, 222 Mont. at 145, 720 P.2d at 1188. This Court concluded that the evidence did not support the Workers' Compensation Court's finding of a drastic loss of earning capacity, especially given Dunn's admissions that she could handle a number of millworking positions, which were not considered by the job service counselor who testified. In so doing, this Court pointed out that the test for lost earning capacity requires analysis of earning ability in the open labor market. *See Dunn*, 222 Mont. at 149, 720 P.2d at 1190.

19. ¶ In this case, Hale, his surgeon, and his vocational rehabilitation consultant testified regarding Hale's physical limitations and their effect on his earning capacity. Hale testified that he made approximately half what he had been making prior to his injury for over four months supervising the brush crew. In addition, Hale testified that he had to work slower than he had previously, causing him to cut fewer trees

which resulted in less income since he was paid by the piece.

20. ¶ Hale's surgeon testified that he would have put the work restrictions that he had recommended to Hale in place, but for his understanding that Royal expected an unrestricted work release. Irrespective of the surgeon's recommended restrictions, Hale's vocational rehabilitation consultant testified that certain jobs would have been eliminated from Hale's labor market based on the information he had obtained from Hale regarding his age of 41 at the time of his injury, his high school education, his work history as a sawyer and millworker, and his physical limitations which prevented prolonged sitting or standing and no heavy lifting. In addition, based on the surgeon's recommended restrictions, the vocational rehabilitation expert testified that job categories classified as very heavy and heavy would have been eliminated from Hale's labor market and the medium category would have been suspect due to the 20-pound torsional lifting limit.

21. ¶ Regardless of the fact that Hale was able to return to his time of injury job, Hale suffered a loss of capacity to perform as well as before the injury and a loss of the ability to compete and earn in the open market. As this Court pointed out in *Fermo*, this qualifies the claimant for diminished earning capacity under § 92-703.1, RCM (1975). 175 Mont. at 350, 574 P.2d at 254. Accordingly, we determine that the Workers' Compensation Court incorrectly applied *Dunn* to this case and erred when it concluded that Hale was not entitled to permanent partial disability benefits under § 92-703.1, RCM (1975). Therefore, the judgment of the Workers' Compensation Court is reversed and we remand this matter to the Workers' Compensation Court for a determination of the amount of benefits owed to Hale under § 92-703.1, RCM (1975) and for an appropriate award of reasonable attorney fees and costs under § 39-71-611, MCA (1975).

22. ¶ Reversed and remanded.

/S/ JIM REGNIER


We Concur:

/S/ J. A. TURNAGE

/S/ WILLIAM E. HUNT, SR.

No

/S/ JAMES C. NELSON

/S/ W. WILLIAM LEAPHART